## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BIOMIN AMERICA, INC.,

      Plaintiff,

      v.

LESAFFRE YEAST CORPORATION,
BRETT BELL, and ANNA CROCKETT,

      Defendants.

Case No. 2:20-cv-02109-HLT

## MEMORANDUM AND ORDER

Plaintiff Biomin America, Inc. ("Biomin") brings this action against Defendant Lesaffre Yeast Corporation ("Lesaffre") and two former Biomin employees—Defendants Brett Bell and Anna Crockett—who now work for Lesaffre. Doc. 1. Biomin also moves for a temporary restraining order under Federal Rule of Civil Procedure 65. Doc. 8. Biomin's motion seeks to enforce the Non-Competition, Non-Solicitation, and Confidentiality covenants in the employment agreements Bell and Crockett executed during their tenure at Biomin, which Biomin claims they have breached. The motion is fully briefed.[1] In moving for a TRO, Biomin seeks extraordinary relief and thus bears the burden of clearly and unequivocally establishing the need for such relief. Because the Court finds that Biomin has not met this burden on the current record, the Court denies the motion for TRO.

---

[1]    On March 18, 2020, the Court held a telephonic status conference with counsel for the parties to discuss administrative issues associated with Biomin's motion for TRO, including logistical difficulties occasioned by the current pandemic. Given the unique difficulties posed at this time—such as the inability of out-of-state counsel and witnesses to travel to Kansas for a hearing—counsel agreed that an evidentiary hearing on the motion was neither feasible nor necessary. The Court thus resolves the motion on the papers and the evidence submitted by the parties.

## I.    BACKGROUND

### A.    New Arguments and Evidence in Reply and Surreply

Before reciting the pertinent facts and addressing the merits of the arguments, the Court first addresses certain outstanding issues regarding Biomin's reply and Defendants' proposed surreply. Following submission of Biomin's reply, Defendants sought leave to file a surreply to address two areas of new argument and evidence advanced in the reply. Doc. 28. The Court entered an order granting the motion for leave with the caveat that it would decide later—at the time it ruled on Biomin's motion for TRO—whether to disregard any new information in the reply or consider it <u>and</u> the surreply. Doc. 29; *see also Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) (noting that when new evidence or argument is included in a reply, a court may either "permit[ ] a surreply" or "refrain[ ] from relying on any new material contained in the reply brief").

The Court hereby exercises its discretion to permit Defendants' surreply (Doc. 30) and thus considers the new arguments and evidence presented in Biomin's reply—and Defendants' response to those new arguments in their surreply—in its resolution of the TRO motion. But, although the Court considers these materials, the parties should not assume this will be the course of the case going forward. The Court expects the moving party to include its arguments and evidence in the opening motion. Late submissions and new facts and evidence offered in a reply that were available at the time the initial motion was filed will likely not be considered in the future.

### B. Factual Summary[2]

The following background is a high-level summary of the facts pertinent to Biomin's motion for TRO. More specific facts are incorporated into the Court's analysis as necessary.

### 1. The Parties

Biomin is an animal health and nutrition company based in Overland Park, Kansas. Doc. 1 ¶¶ 6, 14. Biomin develops and delivers feed additives for livestock—including poultry, swine, ruminants (particularly cattle), and aquaculture—and is considered a market leader in mycotoxin risk management products and solutions as well as salmonella control products and solutions. *Id.* at ¶¶ 14-15. Biomin's products include: (1) Biofix®, a feed additive that counteracts secondary metabolic products of molds present on almost all agricultural commodities; and (2) Poultry Star®, which, among other things, promotes beneficial gut microbiota and reduces bacteria like salmonella and E. coli in multiple species of poultry. *Id.* at ¶ 16.

Lesaffre, meanwhile, is a Wisconsin-based manufacturer and seller of yeast products. *Id.* at ¶ 8; Doc. 25-2 ¶ 13. Lesaffre supplies yeast to the baking industry (as an ingredient in products like breads, rolls, and dough) and also operates a Phileo business unit that supplies yeast to the agricultural industry to be used in feed additives for various animals. Doc. 25-2 ¶ 13. Biomin alleges that two of Lesaffre's yeast-based products, SafWall® and SafMannan®, directly compete with Biofix® and Poultry Star®. Doc. 1 ¶ 18.

Both Bell and Crockett—who are based in Georgia and North Carolina, respectively—are former Biomin employees who are currently employed by Lesaffre. *Id.* at ¶¶ 9-10, 20, 22, 27, 29. For more than five years, Bell was Sales Director of Biomin's Ruminant and Poultry Divisions.

---

[2] The following facts are alleged in the verified complaint, the exhibits attached to the verified complaint, and the declarations and other evidence submitted in connection with this motion.

*Id.* at ¶ 20. In this position, Bell was responsible for and oversaw Biomin's entire ruminant sales team in every state of the United States, and, as of May 2018, also assumed responsibility of Biomin's nationwide poultry sales team. *Id.* at ¶ 21. Crockett, meanwhile, was a Key Account Manager for Biomin's Swine and Poultry Divisions, wherein she reported directly to Bell (until his resignation) and was assigned Biomin's "key" customer accounts, meeting with customers in a total of 16 states (including Kansas) and Canada. *Id.* at ¶¶ 27-28.

### 2. The Employment Agreements

In connection with their employment with Biomin, both Bell and Crockett signed Biomin's Proprietary Information, Confidentiality, Non-Solicitation, and Non-Competition Agreement (collectively, the "Employment Agreements"), which governs certain contractual obligations with Biomin. *See* Docs. 1-1, 1-2.

As the title implies, the Employment Agreements impose several restrictive covenants.[3] The Non-Competition provision states in pertinent part:

> **Non-Competition.** I agree that I will not, for one (1) year following the termination of my employment with the Company by either party . . . engage or participate in any business that is in competition in any manner whatsoever with the Company's business, in any state of the United States or in any other country in North America in which the Company has solicited, bid for, contracted for, or provided products or services to customers in excess of $25,000 at any time within two (2) years preceding the termination date of my employment; provided, however, that this restriction shall not be deemed to prohibit my employment with a competing organization in a capacity which is not, directly or indirectly, involved with or supportive of the competing portion of such competitive organization's business, ***and*** I am employed by such competitive company to perform services of a different type than the services I performed on behalf of the Company.

---

[3] Based on the Court's review, the pertinent provisions are nearly identical in both Employment Agreements—the only difference being that the Confidentiality provision in Bell's Employment Agreement defines "trade secrets" under Missouri law and Crockett's defines "trade secrets" under Texas law. *See* Doc. 1-1 at 1; Doc. 1-2 at 1. This distinction is irrelevant to the Court's resolution of this motion. The Court also notes that Texas law appears to govern both Employment Agreements. *See* Doc. 1-1 at 4; Doc. 1-2 at 4.

Doc. 1-1 at 2; Doc. 1-2 at 2 (emphasis in originals). The Non-Solicitation provision, meanwhile,

provides:

> **Non-Solicitation.** I agree that I will not, for one (1) year following the termination by either party of my employment with the Company . . . do business with, solicit business from, or engage in business with, any person or entity which is or has been a customer of [the] Company during the term of my employment with the Company and with whom I dealt by reason of my employment with the Company, where such business is in competition with the business of [the] Company.
>
> I agree that I will not, during my employment and for one (1) year following the termination by either party of my employment with the Company . . . : (i) personally participate or be materially involved in any manner in the hiring or attempt to hire as an employee, or in any other capacity, any person who is at the time of such hiring an employee of the Company; (ii) otherwise, directly or indirectly, induce or attempt to induce any employee of the [C]ompany to leave the [C]ompany's employ; (iii) engage in any activity that would cause any employee to violate any agreement with the Company, or (iv) otherwise interfere with the employment of any such employee.

Doc. 1-1 at 2; Doc. 1-2 at 2. Finally, the Confidentiality provision states:

> **Confidentiality.** At all times, either during my employment with the Company or following termination of such employment by either party for any reason, I agree to keep confidential, not to disclose, assign, transfer, convey, communicate, or make any use of any trade secrets . . . , confidential information, knowledge, or other information, directly or indirectly, except as required in the course of my activities on behalf of the Company or as specifically authorized by the Company.
>
> . . .
>
> Confidential information includes, but is not limited to: information proprietary to the Company and not generally known, including . . . any subject matter pertaining to the business of the Company or any of its clients . . . Confidential information also includes any and all data and information relating to the business of Biomin® USA whether constituting a trade secret or not which is or has been disclosed to employee as a consequence of or through his

> relationship with Biomin® USA, which has value to the [C]ompany and is not generally known by competitors of the [C]ompany.
>
> I agree that the nature of my employment will require the Company to disclose to and grant me access to Confidential Information, and I may also contribute to the development of Confidential Information on behalf of the Company. I agree that disclosure of Confidential Information to others would cause the Company irreparable harm. I agree that I shall not disclose to any person or utilize for my own benefit any trade secrets of the [C]ompany at any time without the express written authorization of the [C]ompany.

Doc. 1-1 at 1; Doc. 1-2 at 1.

### 3.    The Dispute

On June 12, 2019, Bell notified Biomin's president, Simon Walley, that he would be leaving his employment with Biomin to accept a position as the North American Director of Lesaffre's Phileo division. Doc. 25-2 ¶ 3. Following a transitional period, Bell officially left Biomin on July 5, 2019. *Id.* at ¶ 5. Approximately six months after Bell's departure from Biomin, Crockett followed suit, tendering her resignation on December 27, 2019. Doc. 25-3 ¶ 3. Crockett subsequently reached out to Bell regarding the potential of joining him at Lesaffre. *Id.* at ¶ 4. Lesaffre ultimately offered Crockett a position as a Regional Sales Manager with its Phileo division, which Crockett accepted. *Id.* at ¶ 5. Crockett's resignation from Biomin was effective January 10, 2020. Doc. 1 ¶ 29. Although Crockett's sales territory with Lesaffre is larger than the one she held while employed by Biomin, it does overlap. Doc. 25-3 ¶ 5.

After Crockett's resignation, Biomin suspected Bell and Crockett were violating their Employment Agreements. Following a round of cease-and-desist letters and other unsuccessful negotiations between the parties and counsel, on March 6, 2020, Biomin filed this lawsuit against Lesaffre, Bell, and Crockett.[4] Doc. 1. Three days later, Biomin also filed the present TRO motion,

---

[4]    The verified complaint asserts claims for: injunctive relief (Count I against Bell and Count II against Crockett); breach of contract (Count III against Bell and Count IV against Crockett); misappropriation of trade secrets

which seeks to enforce the Non-Competition, Non-Solicitation, and Confidentiality covenants in the Employment Agreements. Doc. 8.

## II.     STANDARD

To obtain a temporary restraining order, the moving party must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.[5] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). Because this relief is an extraordinary remedy, it should be granted only when the moving party clearly and unequivocally demonstrates its necessity. *See Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1204-05 (D. Kan. 2003). "The issuance of a [TRO] or other preliminary injunctive relief is within the sound discretion of the district court." *Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 906 (D. Kan. 1995).

## III.    ANALYSIS

Biomin asserts that Bell and Crockett—with Lesaffre's assistance—are violating their Employment Agreements, and, therefore, seeks a TRO to enjoin them from doing so. The Court denies Biomin's motion.

Highly summarized, Biomin has not come forward with evidence supporting an entitlement to the extraordinary relief that it requests. This is at least partially due to the overarching issue

---

(Count V against all Defendants); tortious interference (Count VI against Lesaffre and Count IX against Bell); civil conspiracy (Count VII against all Defendants); and unfair competition (Count VIII against all Defendants). *See* Doc. 1.

[5]  When the opposing party has been notified and a hearing held before the issuance of a TRO, the specific requirements of Rule 65(b) do not apply. *See Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 906-07 (D. Kan. 1995). In such a case, courts follow the same procedure as a preliminary injunction motion. *Id.* at 907. Here, although—as explained in footnote 1 and at the agreement of the parties—no evidentiary hearing was held, Defendants were notified of the pending motion and had the opportunity to respond and present evidence. Therefore, the Court applies the preliminary injunction factors in resolving this motion (and, indeed, both parties cite those factors in their respective briefing).

that—although somewhat cured by the new evidence and arguments Biomin includes with its reply (which, as discussed in Part I.A, above, the Court exercised its discretion to consider)—many of the "facts" asserted in the verified complaint are not actually even facts, and, rather, are just conclusory statements preceded by the qualifier "on information and belief." *See* Doc. 1 ¶¶ 5, 22, 29, 38-41. Even though the evidentiary burden is relaxed at this stage, Biomin must do more than substantiate its allegations with mere "information and belief," especially given the nature of the relief sought. *See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971) (noting that "the district courts have shown appropriate reluctance to issue [preliminary injunctive relief] where the moving party substantiates his side of a factual dispute on information and belief").[6]

Simply put, Biomin bears the burden, as the moving party, to clearly and unequivocally demonstrate the necessity of the requested preliminary injunctive relief. Biomin has not met that burden at this stage. Having addressed this threshold issue, the Court proceeds with its analysis of the TRO factors.

## A. Likelihood of Success on the Merits

The gravamen of this action is Biomin's allegation that Bell and Crockett have breached the restrictive covenants in their Employment Agreements: the Non-Competition, Non-Solicitation, and Confidentiality provisions. Each of Biomin's claims is ultimately grounded in

---

[6]     In its reply, Biomin cites *API Americas Inc. v. Miller*, 2017 WL 11487294 (D. Kan. 2017), to support its argument that "courts in this District have granted temporary restraining orders based on verified complaint allegations premised on 'information and belief.'" *See* Doc. 26 at 11-12. But *API* is easily distinguishable from the circumstances presented here. In *API*, the plaintiff asserted in its verified complaint that, upon information and belief, its former employee had used its trade secrets "in breach of his non-disclosure covenants and for his own direct personal gain and benefit, and likely the direct or indirect gain and benefit of [the plaintiff's] direct competitor." 2017 WL 11487294 at *5. The court granted the request for TRO. *Id.* at *6. But a review of the complaint in that case reveals much more robust factual allegations than are present here; in particular, the plaintiff asserted, <u>without qualification</u>, that its former employee had emailed himself the plaintiff's confidential and trade secret information and then taken that information to a direct competitor and used it to make a competing bid for one of the plaintiff's largest customers. The facts alleged by Biomin here do not come close to that level.

this contention. In determining whether Biomin has demonstrated a likelihood of success (the first factor in the TRO analysis), the Court therefore analyzes the merits of a claim for breach of each of those three provisions. And, for the reasons discussed below, the Court concludes that Biomin has not met its burden to present facts and evidence showing a likelihood that Crockett and Bell breached any of the provisions.[7]

### 1. Non-Competition Provision

The Court first addresses the allegations regarding breach of the Non-Competition provision. The full text of the Non-Competition provision is set forth in Part I.B.2, above. In its verified complaint, Biomin alleges Bell and Crockett violated this provision because they are engaged in business that is in competition with Biomin's business within the restricted areas of their respective covenants. Doc. 1 ¶ 4.

There are two problems with Biomin's allegations at this stage. First, at a general level, Biomin has not established that the two entities are in competition. As expected, the parties' arguments as to this provision primarily center on whether Biomin and Lesaffre are "competitors" and both sides come forward with evidence supporting their respective positions. Defendants present evidence with their opposition suggesting that Lesaffre and Biomin are not competitors, and, rather, that Lesaffre's products are further "upstream" in the chain of commerce. Doc. 25 at 8-10. Biomin, meanwhile, comes forward in its reply with evidence suggesting they are in direct competition (although this somewhat contradicts Biomin's earlier characterization of Lesaffre as merely an "emerging competitor," *see* Doc. 9 at 3). Doc. 26 at 4-9. Based on the information presented, the Court concludes that it does not have a robust enough understanding of the industry

---

[7] The parties also make some arguments regarding the enforceability of the three provisions, but even accepting Biomin's position that the provisions are enforceable, the Court finds that Biomin has not shown evidence supporting a likelihood of breach, and, therefore, does not reach the enforceability issue.

to discern from the limited record and contradictory evidence whether the companies are competitors at this point in the proceedings.

That leaves the Court with only a few salient facts at this stage, which indicate that Biomin did not, in fact, consider Lesaffre a competitor. First, there is the delay between when Bell left his employment with Biomin and when Biomin began investigating whether Bell was in violation of his Non-Competition agreement (and the other provisions). Bell notified Biomin's president (Walley) on June 12, 2019, that he would be leaving Biomin to accept a position as the North American Director of Lesaffre's Phileo division. Doc. 25-2 ¶ 3. Biomin thus knew in June 2019 what position Bell was taking and where he was going. But Biomin did not take any action until January 2020, <u>almost seven months</u> after Bell first gave notice of his resignation. For example, there is no evidence that Biomin objected to Bell accepting this role or sent a letter to Lesaffre advising it of Bell's Employment Agreement or suggesting that Bell was violating that agreement by working at Lesaffre. The fact that Biomin had information regarding Bell's new position and company and yet took no action for seven months suggests that Biomin did not think Bell would be competing with Biomin in his new role (or that Lesaffre was a competitor). Second, as Bell stated in his declaration, Biomin even asked him to stay on longer than originally anticipated to ease the transition. *Id.* at ¶ 5. Bell even met with his replacement, Jason King, and Walley at an airport after Bell had started at Lesaffre to help integrate King into Biomin. *Id.* These facts further suggest that Biomin did not view Bell as having abandoned it for some competitor. To be clear, the Court is not deciding whether Biomin and Lesaffre are, or are not, competitors. Rather, the Court simply finds that these facts tip the scales in Lesaffre's favor at this stage of the analysis.

The Court thus concludes that, based on the limited record currently before it, Biomin has not met its burden at this stage of demonstrating a likelihood of success on a claim for breach of the Non-Competition provision.

## 2. Non-Solicitation Provision

The Non-Solicitation provision has two components, both of which Biomin contends have been breached. The first part—the "Customer Non-Solicitation" provision—prohibits Bell and Crockett from soliciting customers with whom they dealt on behalf of Biomin and where such business is in competition with the business of Biomin. *See* Doc. 1-1 at 2; Doc. 1-2 at 2. The second part—the "Employee Non-Solicitation" provision—prohibits them from "personally participating or being materially involved in any manner" in hiring away a Biomin employee. *Id.*

### a. Non-Solicitation of Customers

Here, Biomin alleges that Bell and Crockett breached the Customer Non-Solicitation provision because they—in concert with Lesaffre—have solicited Biomin customers, with whom they dealt during their employment at Biomin, to a competing business. Doc. 1 ¶¶ 38-40. Biomin identifies those customers as: (1) Westway Feed Products ("Westway"), North America's largest manufacturer of liquid supplements for livestock; (2) Mountaire Farms ("Mountaire"), the world's sixth largest chicken producer; and (3) Cooperative Feed Dealers ("CFD"), one of Biomin's major ruminant feed customers. *Id.*; Doc. 26 at 7-8.

As discussed in Part III.A.1 in connection with the Non-Competition provision, Biomin's arguments on this point overarchingly suffer because it has not established that Biomin and Lesaffre are even competitors. The Customer Non-Solicitation provision only prohibits Bell and Crockett from soliciting customers with whom they dealt on behalf of Biomin "where such

business is in competition with the business of the Company." Doc. 1-1 at 2; Doc. 1-2 at 2 (emphasis added).

The argument suffers from further infirmities as well when analyzed as to the identified customers. The Court first addresses the allegations as to Westway and Mountaire. Biomin's initial allegations that Bell and Crockett had improperly solicited these two customers—made upon information and belief—were vague and conclusory. Biomin elaborated in its opening motion (without evidentiary support) that it "recently learned" that Bell "has been in contact" with Westway, and that Crockett—"likely in concert with" Lesaffre and Bell—had "recently hosted an event for Mountaire." Doc. 9 at 6. In response, Defendants admit the conversations took place and offer more information regarding the circumstances of those interactions. Doc. 25-2 ¶ 9; Doc. 25-3 ¶ 6. Thus, although it is uncontroverted that Bell and Crockett have talked to those customers, there is no evidence to suggest that those communications were nefarious or violated the Customer Non-Solicitation provision. In seeking extraordinary relief, Biomin must rely on more than mere inferences.

In its reply, Biomin attempts to bolster its allegations—at least as to Mountaire—with a declaration from Samuel Clark, a Poultry Key Account Manager for Biomin. Doc. 26-3. In his declaration, Clark states he spoke with Travis Ralph, a Feed Ingredient Purchasing Manager for Mountaire, at a trade conference and that Ralph told him that Crockett had taken Ralph to Top Golf a previous evening. *Id.* at ¶¶ 3-4. Clark states it was his "impression" from his conversation with Ralph that Crockett was "soliciting [Ralph] and [Mountaire] for potential business." *Id.* at ¶ 5.

But, as Defendants point out in their surreply, this testimony is based almost entirely on hearsay-within-hearsay. Although relaxed evidentiary standards dictate that courts may consider affidavits based on hearsay in evaluating requests for preliminary injunctive relief, courts need

not—and should not—overlook the reliability of this evidence when weighing it against other evidence. 13 MOORE'S FED. PRAC. § 65.23[2]; *see also Dig. Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 777 (N.D. Tex. 2012) ("While evidentiary standards at the preliminary injunction stage are less formal, and the court may rely on otherwise inadmissible evidence at [this] stage and may issue a preliminary injunction without the presentation of evidence, it can do so only when the facts are not disputed."). Affidavits based on personal knowledge will be more persuasive and are accorded more weight than affidavits based on hearsay. 13 MOORE'S FED. PRAC. § 65.23[2]. Here, both Bell and Crockett, based on their personal knowledge, detail the substance of their interactions and confirm that they have not solicited Mountaire—or Westway or any of their former Biomin accounts—to transfer business to Lesaffre or to compete with Biomin for business. Doc. 25-2 ¶¶ 9-11; Doc. 25-3 ¶¶ 6-8. At this stage and based on the record before it, the Court gives those statements more weight than Clark's hearsay statements and related inferences regarding Crockett's alleged solicitation of Mountaire.

The Court next addresses Biomin's allegations regarding Bell's alleged solicitation of CFD, raised for the first time in the reply. With its reply, Biomin submits a declaration from Katelynn Robbins—currently employed by Biomin as a Ruminant Key Account Manager—stating that Eric Reid, CFD's Director of Nutrition, told her that Bell had told him that Lesaffre's SafWall® "can bind zeralenon, a mycotoxin, cheaper than Biofix®." Doc. 26-2 ¶¶ 1, 3-4. Biomin reasons that, because Bell dealt with CFD during his former employment with Biomin, this alleged communication violated the Customer Non-Solicitation provision. Doc. 26 at 8. But there are two problems with these allegations. First, Bell's alleged statements to Reid could be subject to multiple interpretations; some nefarious, and some not. Again, in seeking extraordinary relief, Biomin must come forward with more than vague statements amenable to multiple interpretations.

Second, Robbins's testimony also suffers the same shortcoming as Clark's—it is based almost entirely on hearsay-within-hearsay. And, again, although the Court may consider this testimony in evaluating the TRO motion, the Court accords more weight to Bell and Crockett's statements (based on their personal knowledge) outlining their interactions and stating that they have not solicited any of their former Biomin accounts to transfer business to Lesaffre or to compete with Biomin for business. Doc. 25-2 ¶ 11; Doc. 25-3 ¶ 8.

On balance, taking the evidence as a whole, the Court thus finds that Biomin has not met its burden at this stage of demonstrating a likelihood of success on a claim for breach of the Customer Non-Solicitation provision.

### b. Non-Solicitation of Employees

Biomin also contends Bell violated the Employee Non-Solicitation provision by improperly soliciting Biomin employees to work for Lesaffre: namely, Crockett and Susan Dunham (who is identified for the first time in the reply).[8] The Court first addresses the allegations as to Crockett. Biomin alleges that Bell "personally participated in or was materially involved in the solicitation of" Crockett to Lesaffre. Doc. 1 ¶ 36. Biomin's evidence for this allegation—which originally consisted of just that conclusory assertion in its verified complaint—has since been bolstered by phone records showing that Crockett and Bell were in communication in the months leading up to her resignation. Doc. 26-6 at 70. Biomin suggests that the Court should infer, based on the mere fact of communication and those records (which do not identify the content of any communication), that Bell had a hand in soliciting Crockett to Lesaffre. Doc. 26 at 9-10.

---

[8] Although not directly addressed (and therefore not directly addressed by the Court), it seems this provision must also contain some limitation on soliciting an employee to a <u>competing</u> business and, in that case, it would be problematic on the instant record for the same reasons discussed in Part III.A.1, above. Otherwise, absent some form of limitation, this provision would seem to prevent hiring a Biomin employee to do construction work, clean a house, or perform some other entirely unrelated type of work.

But the contents of an email sent by Bell to Walley in early January 2020—referenced in the opposition and attached to the reply—shed light on Bell and Crockett's communications and cast doubt on Biomin's proposed inference. Doc. 29-6 at 69. In that email, Bell told Walley that Crockett had reached out to him about an open poultry position at Lesaffre but that he had encouraged her to "stick with" Biomin. *Id.* Bell then explained that, after Crockett resigned from Biomin, she again reached out about the Lesaffre position. *Id.* At that point the position was already filled, but, because Bell thought Lesaffre could use Crockett in another role, Lesaffre interviewed her and decided to extend an offer. *Id.* This account is consistent with Crockett's declaration (submitted with Defendants' opposition) wherein she stated that she did not accept the Lesaffre position until after she had already resigned from Biomin and, further, that she reached out to Bell regarding the potential of joining him at Lesaffre—not the other way around. Doc. 25-3 ¶ 4.

Although a more developed record could lead to a different conclusion, this record does not demonstrate a likelihood that Bell engaged in improper "solicitation." The term solicit "does not encompass mere contact between an ex-employee and [his] former colleagues, and it does not encompass responding to questions and requests regarding [his] new employer initiated by [his] former colleagues." *See Hunter Grp., Inc. v. Smith*, 9 F. App'x 215, 219 (4th Cir. 2001) (affirming district court's finding that ex-employee did not violate her non-solicitation clause where she did not initiate contact with former colleagues, but rather only supplied information to them in response to their questions). Putting aside speculation and inference, Biomin has not presented any evidence that Bell initiated contact with Crockett or that his communications crossed into improper solicitation. Rather, the evidence suggests that Bell encouraged Crockett to stay with Biomin and only supplied information to her in response to her inquiries after she submitted her resignation. The Court recognizes that a communication that does not begin as a solicitation can evolve into a

solicitation at some point, and that Biomin may perhaps introduce evidence at some point indicating this is the case here. But, based on the current factual record, that is not the Court's conclusion at this point. Whatever may be the limits of a reasonable interpretation of "solicit," Biomin has not shown by a likelihood that those limits are reached on the current record.

The Court next addresses the allegations as to Dunham. Dunham is employed by Biomin as a Poultry Key Account Manager and, at the time of the events in this lawsuit, her sales territory included the Southeast region of the United States. Doc. 26-4 ¶ 1. On September 3, 2019, about two months after Bell officially left Biomin for Lesaffre, Dunham sent Bell a text message asking him how things were going. *Id.* at 3. Bell responded: "I am good. How about you. I need a poultry person if you know of anybody." *Id.* Dunham then asked Bell what area he needed a poultry person for and Bell responded "Southeast." *Id.* Biomin contends these messages are evidence that Bell breached his Employee Non-Solicitation covenant and, to this effect, presents a declaration from Dunham stating that she interpreted Bell's communication as "gauging [her] potential interest in working with him at Lesaffre's Phileo Division." Doc. 26 at 9; Doc. 26-4 ¶ 4.

The messages, however, are subject to multiple interpretations. It is possible to interpret Bell's message as an attempt to solicit Dunham for Lesaffre's open poultry position. But it is equally possible that Bell was simply making conversation and seeking a reference from Dunham for someone who might be interested in the job given that Dunham works in that particular market. Indeed, Biomin's statement in its brief that "Defendant Bell texted Susan Dunham" and "told her that he 'need[ed] a poultry person'" omits the full context of that communication. Bell did not text Dunham out of the blue about an open job; rather, he was responding to a communication that Dunham initiated. And, again, the term "solicit" does not encompass mere contact between Bell

and his former colleagues—including Dunham—nor does it encompass Bell's simple response to Dunham's questions. *See Hunter Grp.*, 9 F. App'x at 219.

In sum, the Court cannot conclude, based on mere inferences and speculation, that Biomin has shown a likelihood of success on its claim that Bell has violated his Employee Non-Solicitation provision.

### 3. Confidentiality Provision

Finally, the Court addresses the allegations regarding breach of the Confidentiality provision. During their respective terms of employment, Bell and Crockett were granted access to, and acquired, intimate knowledge of Biomin's confidential, proprietary, and trade secret information. Doc. 1 ¶ 34. The Confidentiality provision, at a high level, requires that Bell and Crockett maintain the confidentiality of that information and those trade secrets, which include customer lists, customer information, marketing strategies, pricing, and the like. *See* Doc. 1-1 at 1; Doc. 1-2 at 1. Biomin alleges that Bell and Crockett, in concert with Lesaffre, violated that provision by using its confidential information and trade secrets to solicit customers to Lesaffre. Doc. 1 ¶¶ 40-41.

However, all Biomin offers to support its allegation of breach is that conclusory allegation, made on information and belief. Biomin does not come forward with facts or evidence showing that Bell and Crockett did, in fact, use its trade secrets or other confidential information in soliciting Biomin customers. Biomin does not even <u>identify</u> any specific trade secret or other confidential information that was allegedly used. In its motion, Biomin reasons that given "the fact that Defendants Bell and Crockett are now calling on Biomin's customers on behalf of Defendant Lesaffre, they are very likely using Biomin's confidential and proprietary information to Defendant Lesaffre's benefit, and to Biomin's detriment, in the marketplace." Doc. 9 at 16. But,

although it may be reasonable to infer that an employee who leaves a company to take a similar position at a competitor company may use the information they learned in their previous job in their new role, Biomin does not get the benefit of that inference here because, as discussed above, based on the current record the Court cannot conclude that Biomin and Lesaffre are competitors and also cannot discern the specifics of Bell and Crockett's roles. Put differently, because the Court cannot conclude that the entities are competitors, the Court cannot simply infer that Bell and Crockett are "very likely" using Biomin's confidential information and trade secrets in their current roles at Lesaffre without any evidence suggesting that is the case.

For all of these reasons, the Court concludes that Biomin has not met its burden to establish a likelihood of success on the merits with respect to the purported breach of any of the three provisions that form the basis for its claims in this case. The likelihood of success factor thus weighs in favor of Defendants.

### B.     Irreparable Harm

Even if Biomin had shown a likelihood of success on the merits, Biomin nonetheless fails to establish the requisite irreparable harm—which is "[p]erhaps the most important prerequisite" for the issuance of preliminary injunctive relief. *Hill's Pet Nutrition*, 258 F. Supp. 2d at 1205. Here, Biomin's irreparable harm argument is premised on two factors: (1) loss of customers, and (2) loss of employees. *See* Doc. 9 at 17-19. Biomin is correct that the "[l]oss of customers, loss of goodwill, and threats to a business' viability have been found to constitute irreparable harm," and, further, that evidence of solicitation of employees can also support a finding of irreparable harm. *See TMFS Holdings, LLC v. Capace*, 2017 WL 495983, at *3 (D. Kan. 2017); *Sirius Comput. Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841-42 (W.D. Tex. 2015).

But Biomin has not come forward with evidence to support a showing of irreparable harm in the absence of the requested relief. With respect to the loss of customers and customer goodwill, Biomin argues that, because Bell and Crockett "dealt with Mountaire Farms and Westway Feed Products while they were employed by Biomin," they therefore "pose a substantial risk of diverting all or a part of these customers' sales" to Lesaffre and may also "divert[ ] the business of other Biomin customers with whom they dealt during their employment with Biomin." Doc. 9 at 17. Notably, however, Biomin does not allege that it has lost business from Westway, Mountaire, or CFD, and does not allege how its relationship with those companies has been interfered with (if at all). Moreover, as discussed above, Biomin has not even established that it and Lesaffre are competitors. As Defendants point out in their surreply, Biomin has not come forward with evidence that "a single Biomin customer, or any customer, has switched to the allegedly 'competing' Lesaffre products." Doc. 30 at 4.

Biomin also argues that Bell's "personal participation and/or material involvement" in Lesaffre's hiring of Crockett is evidence of irreparable harm. Doc. 9 at 18. Again, however, the evidence adduced at this stage does not establish that Bell violated his contractual obligations in connection with Crockett's decision to leave Biomin and accept a job with Lesaffre. Nor does the evidence show that Bell attempted to induce Dunham or any other employee to leave Biomin and join Lesaffre.

In its reply, Biomin argues that it is not required to show that it has <u>already</u> suffered the irreparable harm in order to establish an entitlement to relief. Doc. 26 at 13. But although Biomin is correct that "the injury need not have been inflicted when application is made or be certain to occur," there nonetheless "must be more than an unfounded fear on the part of the applicant." 11A FED. PRAC. & PROC. § 2948.1. "[A] preliminary injunction will not be issued simply to prevent the

possibility of some remote future injury" and, therefore, "[a] presently existing actual threat must be shown." *Id.* Biomin's conclusory allegations that it will lose customers or employees and therefore suffer irreparable harm are not supported by any evidence and, therefore, are purely speculative. And "[a] speculative injury or the mere possibility of harm will not suffice." *Hill's Pet Nutrition*, 258 F. Supp. 2d at 1205.

On the current record, the Court thus finds that Biomin has not met its burden of establishing irreparable harm in the absence of the requested relief. The irreparable injury factor weighs in Defendants' favor.

### C. Remaining Factors

The Court next considers the two remaining factors of its TRO analysis: the balance of the equities—i.e., whether the injury to the movant outweighs the harm to the non-moving party from granting the requested relief—and whether the public interest would be harmed if the TRO is granted.

With respect to the balance of the equities, as a practical matter, the net effect of the proposed relief would be to deprive both Bell and Crockett of their ability to perform the type of work they have been doing for years. Biomin, on the other hand, does not come forward with any argument regarding the specific harm that it will experience in the absence of a TRO, instead simply declaring in a conclusory manner that "[a]ny harm that temporary and preliminary injunctive relief may cause to Defendants is outweighed by the injury that denial of such relief may cause to Biomin." Doc. 9 at 19. But, as discussed in connection with the irreparable harm analysis, Biomin has not come forward with evidence that it will lose customers if the TRO is not granted. It has not even established that Lesaffre is its competitor. If the Court had determined that

Biomin had demonstrated irreparable injury, the balance of the equities might tip in Biomin's favor. But it did not. The Court thus concludes that the balance of equities favors Defendants.

Finally, the Court considers the public interest factor and concludes that this factor is a draw. Biomin is correct that there is generally a public interest in upholding enforceable contracts, protecting valid trade secrets, and preventing unfair competition. *See TMFS Holdings*, 2017 WL 495983, at *4; *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1107 (D. Kan. 2000). But Biomin has not produced evidence establishing that the Employment Agreements are being breached or that Bell and Crockett are using its trade secrets (as discussed above, Biomin does not even identify the specific trade secrets it alleges are being used). And there is also a public interest in preserving competition. *See Mediacom Commc'ns Corp. v. Sinclair Broad. Grp., Inc.*, 460 F. Supp. 2d 1012, 1029 (S.D. Iowa 2006) (agreeing that the "public interest weighed in favor of denying the injunction because competition is preserved when parties bargain freely in free markets without intervention from regulators or the courts"). For these reasons, the Court finds that this factor is neutral.

IV.    **CONCLUSION**

In sum, Biomin has not met its burden to clearly and unequivocally establish the necessity of the extraordinary relief that it seeks. The Court thus denies Biomin's TRO motion. To be clear, Biomin identifies some concerning circumstances and it may well be that injunctive relief is warranted on a more robust record. But, on the instant record, it is not.

The Court also notes that Biomin has moved for leave to conduct limited expedited discovery (Doc. 10) and that the parties included arguments related to that discovery motion in their briefing on the TRO motion. But the docket reflects that the motion for expedited discovery has been referred to the magistrate judge assigned to this case. Although recognizing that, in cases

involving a request for preliminary injunctive relief, expedited discovery is often appropriate, the parties must reach out to the magistrate judge (rather than the undersigned) regarding resolution of that motion.

THE COURT THEREFORE ORDERS that Plaintiff Biomin America, Inc.'s Motion for Temporary Restraining Order (Doc. 8) is DENIED.

IT IS SO ORDERED.

Dated: March 30, 2020 　　　　　　　　　/s/  *Holly L. Teeter*
　　　　　　　　　　　　　　　　　　　　HOLLY L. TEETER
　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE